851 So.2d 466 (2002)
LIBERTY MUTUAL INSURANCE COMPANY
v.
WHEELWRIGHT TRUCKING CO., INC.
GAN North America Insurance Company
v.
Wheelwright Trucking Co., Inc.
Federal Insurance Company
v.
Wheelwright Trucking Co., Inc.
Gerling America Insurance Company
v.
Wheelwright Trucking Co., Inc.
1010818, 1010819, 1010820 and 1010821.
Supreme Court of Alabama.
November 27, 2002.
*468 Brent J. Kaplan of Robins, Kaplan, Miller & Ciresi, L.L.P., Atlanta, Georgia; and Joseph Carpenter, Montgomery, for appellant Liberty Mutual Insurance Company.
Walter J. Price III of Huie, Fernambucq & Stewart, L.L.P., Birmingham, for appellant GAN North America Insurance Company.
Walter J. Price III of Huie, Fernambucq & Stewart, L.L.P., Birmingham; and J. Stephen Berry of Swift, Currie, McGhee & Hiers, Atlanta, Georgia, for appellant Federal Insurance Company.
H.L. Ferguson, Jr., and Stacy A. Linn of Ferguson, Frost & Dodson, L.L.P., Birmingham; and Joseph K. Powers and Lawrence Klein of Sedgwick, Detert, Moran & Arnold, New York City, New York, for appellant Gerling America Insurance Company.
W. Percy Badham III, Robert W. Tapscott, Jr., and Brannon J. Buck of Maynard, Cooper & Gale, P.C., Birmingham; Larry W. Morris and Randall S. Haynes of Morris, Haynes & Hornsby, Alexander *469 City; William H. Robertson of Robertson, Brunson & New, L.L.C., Eufaula; and Paul W. Brunson, Jr., of Robertson, Brunson & New, L.L.C., Clayton, for appellee.
HARWOOD, Justice.
Liberty Mutual Insurance Company, GAN North America Insurance Company, Federal Insurance Company, and Gerling America Insurance Company, the insurers of Dorsey Trailers, Inc. ("Dorsey"), appeal from the respective summary judgments entered against them and in favor of Wheelwright Trucking Company, Inc. ("Wheelwright"), by the Circuit Court of Barbour County in certain garnishment proceedings. We reverse and remand in cases no. 1010818, no. 1010819, and no. 1010820; we affirm in part, reverse in part, and remand in case no. 1010821.

I. History of the Case

In October 1994, Wheelwright and Eufaula Equipment Associates, L.L.C. ("Eufaula"),[1] purchased 44 trailers from Scruggs, Incorporated ("Scruggs"), a trailer dealer. The trailers were manufactured by Dorsey. During the next five years, Liberty Mutual Insurance Company ("Liberty"), GAN North America Insurance Company ("GAN"), Federal Insurance Company ("Federal"), and Gerling America Insurance Company ("Gerling")(hereinafter referred to jointly as "the insurers"), and National Union Fire Insurance Company ("National Union") successively and respectively issued excess commercial liability insurance policies and/or "umbrella" excess liability insurance policies to Dorsey. An "umbrella" commercial liability policy is generally issued in addition to an excess commercial liability policy to provide additional coverage for claims that exceed the limits of the excess commercial liability policy.
On November 8, 1999, Wheelwright and Eufaula sued Dorsey and Scruggs in the Circuit Court of Barbour County on theories of breach of contract, breach of warranty, fraud, and negligence, and asserting a claim under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"). Although the original complaint generally sought damages on the ground that the trailers were defective, those general claims were refined during litigation into claims seeking compensation for "economic damages," i.e., lost profits and lost business opportunities, arising from Wheelwright's inability to use its tractors to haul concentrated heavy loads because, the plaintiffs alleged, the trailers purchased from Dorsey were not suitable to haul those types of loads even though capacity for such loads was specified in the purchase contract and even though Dorsey otherwise represented that the trailers would be able to haul such loads. The insurers and National Union denied Dorsey's request for coverage and refused to provide it with a defense.
In the fall of 2000, Federal, Gerling, and Liberty filed complaints in the United States District Court for the Northern District of Georgia against Dorsey, Wheelwright, and Eufaula seeking judgments declaring that their respective policies did not require them to provide coverage to Dorsey. GAN filed a similar action in the United States District Court for the Middle District of Alabama with respect to coverage under its policies. Those declaratory-judgment actions were subsequently consolidated in the Federal District Court for the Middle District of Alabama. The *470 parties unsuccessfully attempted to mediate their disputes on two occasionsSeptember 12, 2000, and December 6, 2000.
On December 4, 2000, Dorsey filed a petition in the United States Bankruptcy Court of the Middle District of Alabama pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 1101 et seq. The Barbour County action and the federal declaratory-judgment actions were all stayed pursuant to the "automatic stay" provision of 11 U.S.C. § 362. Thereafter, the insurers and National Union all filed motions for relief from the stay in order to proceed with their respective declaratory-judgment actions. In January 2001, Dorsey entered into a settlement agreement with Wheelwright and Eufaula. Wheelwright and Eufaula filed a motion with the bankruptcy court seeking relief from the automatic stay of their action against Dorsey in the Barbour Circuit Court and the approval of a proposed order of the Barbour Circuit Court incorporating the settlement. The insurers and National Union filed objections to the "form and contents" of the proposed order approving the settlement, on the ground that the proposed order contained language concerning the conduct of the insurers that was not substantiated by any evidence. The objections all contained substantially the same language indicating that the insurers and National Union did not object "to the entry of a proper order at the proper time relieving or modifying the stay of 11 U.S.C. § 362 for the purpose of the entry of a consent judgment as announced by the litigating parties...." On January 8, 2001, the bankruptcy court deferred ruling on all pending motions for relief from the automatic stay until January 30, 2001.
On January 17, 2001, Dorsey presented the proposed settlement to the bankruptcy court in what it styled as a "Motion to Compromise and Settle Claim" ("the motion to compromise"). Each insurer was served with a copy of the motion to compromise. In pertinent part, the motion stated:
"To reduce potential claims against the bankruptcy estate and because it is unable to defend the Action, the Debtor has negotiated a resolution whereby the Debtor will agree to a Consent Judgement of $2,500,000 in favor of the Plaintiffs in the Action. The amount of this Consent Judgment is substantially less than the potential liability for the Debtor at trial. In addition, the Plaintiffs have agreed to collect the Consent Judgement only to the extent that the Debtor's insurance provides coverage."

(Emphasis added.) The bankruptcy court held a hearing on the motion to compromise on March 6, 2001; none of the insurers took any action to oppose the motion. On March 9, 2001, the bankruptcy court granted the motion to compromise and lifted the stays as to all of the related lawsuits.
On March 23, 2001, the Barbour Circuit Court entered a judgment against Dorsey ("the consent judgment"). In pertinent part, the consent judgment stated:
"3. To reduce its exposure and because it is financially unable to defend itself, Dorsey has negotiated a Judgment of $2,500,000 in favor of the Plaintiffs. The Plaintiffs have agreed to collect the Judgment only to the extent that Dorsey's insurance provides coverage. Attached hereto and incorporated by reference as Exhibit A is a copy of the Settlement Agreement between the parties and the Order approving said agreement entered by the Honorable William Sawyer, United States Bankruptcy Judge for the Middle District of Alabama dated March 9, 2001. [Exhibit A is not attached to this opinion.]

*471 "4. Dorsey is not, by virtue of this judgment, admitting to any intentional wrongdoing, including fraud.
"Based upon the foregoing, it is hereby ORDERED that a final judgment is entered in favor of Plaintiffs Wheelwright and Eufaula and against Dorsey and that damages are fixed and assessed in the amount of $2,500,000.00 due and owing to Wheelwright[[2]] pursuant to Rule 54(b) of the Alabama Rules of Civil Procedure, there being no just reason to delay the entry of this judgment. It is further ORDERED that the Plaintiffs may proceed with their claims against Scruggs, Inc. and that this action will remain pending."
On the same day, Wheelwright filed petitions for writs of garnishment in the Barbour Circuit Court against the insurers and National Union seeking to collect on the consent judgment. At different times during April 2001, the insurers and National Union removed the respective garnishment petitions to the United States District Court for the Middle District of Alabama. Wheelwright filed motions on April 24 to remand the removed cases to the Barbour Circuit Court and on August 10, 2001, the federal district court determined that the removals were improvident and remanded the cases. The federal district court also stayed the declaratory-judgment actions pending before it until after there had been adjudication by the Barbour Circuit Court of the petitions for writs of garnishment.[3] The insurers and National Union subsequently filed motions with the circuit court requesting that it dismiss the cases or abstain from ruling on the petitions for the writs of garnishment in deference to the adjudication of the declaratory-judgment actions in the federal district court.
Thereafter, the parties conducted further discovery concerning the writs of garnishment and filed cross-motions for a summary judgment. In a detailed order entered on November 13, 2001, the circuit court stated that "[t]he sole issue to be decided in these garnishments is whether any or all of the insurance contracts between Dorsey and the Insurers [and National Union] provide coverage for the judgment entered in this action." The circuit court denied the insurers' and National Union's motions for a dismissal of the garnishment proceedings or abstention by the circuit court from ruling on the petitions. It entered a summary judgment for National Union based upon its determination that National Union's umbrella coverages would not be triggered because the coverages National Union's coverages overlaid would not be exhausted under the pro rata division of coverage liability the court was ordering among the other insurers. Consequently, National Union is not a party to this appeal.
The circuit court also entered summary judgments for Wheelwright against the insurers. The circuit court concluded first that the insurers, by refusing to exercise their right to defend the claims against Dorsey, were "precluded from challenging the validity or amount of the [consent] *472 judgment absent evidence of bad faith orcollusion." Second, the circuit court determined that no evidence of bad faith orcollusion existed. Third, the circuit court determined that the insurers did owe coverage under their respective policies. Specifically, the summary-judgment order determined that Federal, GAN, Gerling, and Liberty were severally liable to Wheelwright for its $2,500,000 judgment against Dorsey, less the payment of a single "self-insured retention" ("SIR") amount of $250,000.[4] The circuit court deducted only a single SIR amount on the rationale that the damage that was the basis of Wheelwright's claims occurred over a continuous period that spanned the coverage periods of the respective insurance policies. Accordingly, the summary-judgment order required each insurer to pay a pro rata share of the judgment as follows:
"a. Liberty, which had coverage from May 1, 1995 to May 1, 1996, is obligated to pay 20% of the total;
"b. GAN, which had coverage from May 1, 1996 to May 1, 1998 but which exhausted coverage in one of its policy periods, is obligated to pay 20% of the total;
"c. Federal, which had umbrella coverage over GAN, is obligated to pay 20% of the total because GAN exhausted its coverage in the policy period from May 1, 1996 to May 1, 1997; and
"d. Gerling, which had coverage from May 1, 1998 to May 1, 2000 is obligated to pay 40% of the total."
The insurers appealed, and the appeals were consolidated for this Court's review.

II. The Facts

A. Wheelwright's Claims

Wheelwright presented evidence showing that it had purchased 44 trailers from Dorsey in October 1994 based upon contractual specifications and upon Dorsey's representations that the trailers were suitable to haul concentrated loads of 50,000 pounds at a point within a four-foot length on each trailer and that they would have a working life of 10 years. Although Wheelwright began using the trailers in December 1994, it did not attempt to haul concentrated loads approximating 50,000 pounds until 1998. During July of that year, one of the Dorsey trailers buckled during an attempt to load a 47,000-pound steel coil onto the trailer. A second Dorsey trailer also proved unable to haul the coil the next day. Thereafter, on December 23, 1998, and February 25, 1999, respectively, a Dorsey trailer experienced a "rollover" which Wheelwright attributed to "design defects." Wheelwright discovered cracking in one of the Dorsey trailers on October 15, 1999, and subsequent inspections showed that 43 of the 44 Dorsey trailers were also experiencing cracking. Wheelwright removed all of the Dorsey trailers from service before the end of 1999.
Wheelwright presented expert testimony from Dr. J. Harold Deatherage, a professor of engineering at the University of Tennessee, indicating that the trailers were defectively designed and that the cracking actually began shortly after they were put into use and worsened with continued use. Deatherage testified by deposition that the cracks would have been discoverable, with appropriate inspection techniques, as early as 1995, even if the trailers had been used until that time only to transport loads of less that half the weight of the steel coils. Deatherage could not state a precise date on which the cracking began or when it would have become evident.
*473 After the failure of the two Dorsey trailers to haul the steel-coil load in July 1998, Wheelwright determined that the trailers could not haul concentrated loads in excess of 45,000 pounds, and it ceased attempting to use them for those loads. Wheelwright presented evidence tending to show that it did not have the financial capacity to rent substitute trailers to haul the concentrated loads. It was therefore unable to accept business from four of its customers involving the hauling of steel coils and it was unable to develop any other business involving that type of cargo.
With respect to proof of damages, Wheelwright presented evidence, including the deposition testimony of Dennis Westbrook, its vice president, showing that the rate for hauling concentrated loads of steel coils was higher than the rate for the freight Wheelwright was forced to accept because it had no trailers to accommodate the concentrated loads. Westbrook testified that because Wheelwright could not use its tractors to deliver concentrated loads, it lost profits because (1) it was forced to use the tractors to haul freight that paid less per mile, (2) it was forced to travel longer distances without loads ("deadhead") because it could not service all of the hauling requirements of its existing customers, and (3) it was unable to establish shipping routes between its existing customers in order to maximize profits. In addition to Westbrook's testimony, Wheelwright presented, as an exhibit to its motion for a summary judgment, a report from Ralph Q. Summerford, a certified public accountant, calculating Wheelwright's losses caused by "Lost Business Opportunities," which included profits it lost as a result of being unable to accept business requiring the hauling of heavy concentrated loads from its existing customers, to be in excess of $3,000,000. Wheelwright asserted that such damages did not include profits lost because of its inability to expand its hauling business to new customers.

B. The Insurance Policies

Liberty issued two excess commercial liability insurance policies to Dorsey that, respectively, provided annual coverage for the period May 1, 1994, to May 1, 1995, and from May 1, 1995, to May 1, 1996. Each policy had a $1,000,000 limit per occurrence and a $2,000,000 limit on the aggregate of all occurrences. Liberty also issued two umbrella commercial liability policies to Dorsey that, respectively, provided coverage for the same period. Each of those umbrella policies had a $10,000,000 limit per occurrence. All of Liberty's insurance policies were delivered to Dorsey at its facility in Elba. All of the policies issued to Dorsey by the other insurers were delivered to Dorsey at its offices in Atlanta, Georgia.
GAN issued two excess general commercial liability insurance policies to Dorsey that, respectively, provided annual coverage from May 1, 1996, to May 1, 1997, and from May 1, 1997, to May 1, 1998. Each policy had a $1,000,000 limit per occurrence and a $2,000,000 limit on the aggregate of all occurrences. For the same coverage period, Federal issued two umbrella commercial liability policies to Dorsey, each of which had a $10,000,000 limit per occurrence.
Gerling issued two excess general commercial liability insurance policies to Dorsey that, respectively, provided annual coverage from May 1, 1998, to May 1, 1999, and from May 1, 1999, to May 1, 2000. Each of these policies had a $1,000,000 limit per occurrence and a $2,000,000 limit for the aggregate of all claims. During the same coverage period, National Union issued two umbrella commercial liability insurance policies to Dorsey providing coverage from May 1, 1998, to May 1, 1999, *474 with a $20,000,000 limit per occurrence, and providing coverage from May 1, 1999, to May 1, 2000, with a $30,000,000 limit per occurrence.
All of the excess commercial liability insurance policies are very similar in terms of definitions, coverages, and exclusions. The umbrella policies are equally similar. All of the policies have a SIR of $250,000. The policies each provide that after the payment of the SIR, the insurer "will pay those sums in excess of the `Self-Insured Amount' that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage' to which this excess insurance applies." The record contains evidence in the form of letters from Dorsey and its lawyers indicating that at least by the first attempted mediation of the case in September 2000, Dorsey had attempted to tender the SIR amount. The circuit court found that Dorsey had effectively tendered payment of the $250,000 SIR amount but that the insurers had declined to accept the tender on the ground that their respective policies did not provide coverage.
All of the policies, except those issued by Liberty, provided that the respective insurer would have the duty and the right to defend any action seeking damages; Liberty's policy gave it the right, but not the duty, to do so. In each respective policy's definitions section, "property damage" is defined as
"a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
"b. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the `occurrence' that caused it."
Similarly, all of the policies define an "occurrence" as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions." [5] All of the policies provide that they apply only to property damage which occurs during the policy period.

III. Choice of Law

The parties do not present any direct argument concerning principles of choice of law, but the fact that the Liberty policies were issued in Alabama and the other insurers' policies were issued in Georgia raises the issue. All of the insurers present substantially the same arguments Liberty asserts that the authorities it cites warrant reversal of the summary judgment under Alabama law, and GAN, Gerling, and Federal argue that the authorities they cite warrant reversal of the summary judgment under Georgia law. The insurers all made substantially the same arguments on the law of the respective states in their arguments to the circuit court at the summary-judgment stage. We infer, therefore, that the insurers have all given notice that they are relying on Alabama law and Georgia law, respectively, pursuant to Rule 44.1, Ala. R.Civ.P. That rule provides:
"A party who intends to raise an issue concerning the law of another state or of any territory or dependency of the United States or of a foreign country shall give notice by pleadings or other reasonable written notice. The court, in determining such law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Alabama *475 Rules of Evidence. The court's determination shall be treated as a ruling on a question of law."
Wheelwright addresses the insurers' arguments simply by asserting that the summary judgment is proper against Liberty under Alabama law and is proper against the other insurers under Georgia law. Although Wheelwright's claims cover both contractual and tort issues, none of the parties specifically argue choice-of-law principles relating to contract claims, see, e.g., Cherry, Bekaert & Holland v. Brown, 582 So.2d 502 (Ala.1991)(discussing Alabama's choice-of-law principles as they relate to contract claims), or choice-of-law principles relating to tort claims, see, e.g., Fitts v. Minnesota Mining & Mfg. Co., 581 So.2d 819 (Ala.1991)(discussing Alabama's choice-of-law principles as they relate to tort claims). Moreover, as far as the record reveals, no such arguments were presented to the circuit court. The summary-judgment order does point out the state origins of the respective policies at issue, but it does not make any explicit determination as to the application of Alabama or Georgia law. Nonetheless, the parties' arguments on this appeal are premised on the assumption that Alabama law governs the disposition of Liberty's appeal and that Georgia law governs the disposition of the appeals of the other insurers, and no argument to the contrary is raised by any party.

IV. Arguments

The insurers argue that the circuit court erred in determining that they were precluded from contesting the amount and validity of the consent judgment. The insurers also assert that the circuit court erred in determining that they owed Dorsey coverage against Wheelwright's claims under the provisions of their respective insurance policies.

A. The Insurers' Challenge to the Consent Judgment

The circuit court based its conclusion that the insurers were precluded from challenging the consent judgment upon the rule under Georgia law that
"[w]hen an insurer denies coverage and absolutely refuses to defend an action against an insured, when it could do so with reservation of its rights as to coverage, the legal consequence of such refusal is that it waives the provisions of the policy against a settlement by the insured and becomes bound to pay the amount of any settlement made in good faith plus expenses and attorneys' fees."
Georgia Southern & Florida Ry. v. United States Cas. Co., 97 Ga.App. 242, 244, 102 S.E.2d 500, 502 (1958). See also Atlanta Milling Co. v. Norris Grain Co., 271 F.2d 453 (5th Cir.1959); McCraney v. Fire & Cas. Ins. Co., 182 Ga.App. 895, 357 S.E.2d 327 (1987); and LaSalle Nat'l Ins. Co. v. Popham, 125 Ga.App. 724, 188 S.E.2d 870 (1972).
The rule in these Georgia cases has a counterpart in Alabama law in the case of Stone Building Co. v. Star Electrical Contractors, Inc., 796 So.2d 1076 (Ala.2000). In Stone Building, Stone, a contractor, cross-claimed against Star, its subcontractor, to recover expenses Stone had incurred in settling a lawsuit filed by an employee of Star who had been injured on the job site where Stone and Star were working. The Star employee had suffered serious physical injuries, and he asserted various claims against Stone and Star based on negligence and wantonness. Stone's cross-claims were based upon provisions in the subcontract that required Star to maintain insurance for the benefit of Stone and to indemnify Stone against liability claims arising out of the work. After protracted litigation, during which Stone presented various demands to Star *476 for indemnification and finally filed its cross-claim, Stone settled with the employee for $495,000. Star eventually obtained a jury verdict in its favor on the employee's claims. The circuit court subsequently entered a partial summary judgment in favor of Star on Stone's cross-claims and dismissed those cross-claims. This Court reversed the summary judgment based on the following statement of the law:
"The general rule is that, `if indemnity is sought against an indemnitor without notice of either the original suit or of the settlement by the indemnitee,' then the indemnitee has the burden of establishing that it was actually liable to the plaintiff and that the settlement was a reasonable one. Watts v. Talladega Fed. Sav. & Loan Ass'n, 445 So.2d 316, 320 (Ala.Civ.App.1984). However, if the indemnitor has been given notice of the action against the indemnitee and has been given an opportunity to defend or to settle the action, then the indemnitor `is precluded from contesting the indemnitee's liability in a subsequent indemnity or third-party action.' Id.

"`Indemnity against losses does not cover losses for which the indemnitee is not liable to a third person, and which the indemnitee improperly pays. A person legally liable for damages who is entitled to indemnity may settle the claim and recover over against the indemnitor, even though he has not been compelled by judgment to pay the loss. In order to recover, the indemnitee settling the claim must show that the indemnitor was legally liable, and that the settlement was reasonable. In the event that an indemnitor is not afforded the alternative of participating in a settlement or conducting the defense against the original claim, an indemnitee settling the claim will have the burden of establishing actual liability to the original plaintiff rather than the lesser burden of showing potential liability.

"`However, when the indemnitor has notice of the claim and refuses to defend, the indemnitor is bound by any good faith reasonable settlement, and the indemnitee need only show potential liability.

"`Practice guide: A practical device by which an indemnitee can protect against the awkward possibility of having to prove the original plaintiff's case against himself, the original defendant, is to offer the indemnitor before any settlement is concluded the choice of (1) approving the settlement or (2) taking over the defense of the case and agreeing to hold the indemnitee harmless in any event for damages which may be assessed against him in excess of the amount of the proposed settlement. If the indemnitor approves the settlement or defends unsuccessfully against the original claim, the indemnitor cannot later question the indemnitee's liability to the original claimant. If the indemnitor declines to take either course, then the indemnitee will only be required to show potential liability to the original plaintiff in order to support his claim over against the indemnitor.'

"41 Am.Jur.2d Indemnity § 46 (1995) (footnotes omitted)."
796 So.2d at 1090 (emphasis added by the Court in Stone Building). The analogy between Star's duty to provide insurance and to indemnify in Stone Building and the insurers' duty to provide a defense in the instant case makes the application in Alabama of the specific rule in Georgia Southern & Florida Ry., supra, logically compelling.
*477 However, although the insurers fail to present any comparably specific precedent challenging this authority, they all, including Liberty, argue that they are entitled to a jury determination of their liability, under the rationale of Atlanta Casualty Insurance Co. v. Gardenhire, 248 Ga.App. 42, 545 S.E.2d 182 (2001), and Driskell v. Empire Fire & Marine Insurance Co., 249 Ga.App. 56, 547 S.E.2d 360 (2001).
In Gardenhire, the insurer, Atlanta Casualty, had refused to provide a defense to its insured, Westbrook, in an automobile-accident case on the ground that an excluded driver, Westbrook's roommate McKinney, was driving. When Gardenhire, the plaintiff and the victim in the accident, sued Westbrook and McKinney, the jury determined that Westbrook had been driving and returned a verdict of $45,000 against only her. Westbrook assigned her claims against Atlanta Casualty to Gardenhire, who immediately sued the insurer for the full amount of the verdict.[6] The trial court entered a summary judgment for Gardenhire, and the insurer appealed, arguing that it was entitled to litigate the question whether the insured had misrepresented herself as the driver in the accident. The Georgia Court of Appeals held that the insurer was collaterally estopped from challenging the jury's determination and was liable to Gardenhire. The court held that the insurer was liable to the extent of the limits of the Westbrook's coverage because the insurer had failed to offer a defense. Although the nature of the claims assigned by Westbrook to Gardenhire are not set out in the opinion, the court also held that the insurer was entitled to a jury determination on the extent of its liability in excess of its coverage, presumably referring to a claim of bad-faith failure to offer a defense.
In Driskell, the plaintiffs sued a motor carrier, Metro Carrier, for damages they sustained in an automobile accident with one of its vehicles. Empire Fire and Marine Insurance Company, Metro's insurer, refused to provide a defense on the ground that Metro's vehicle was not being operated by its employee at the time of the accident. Empire brought a declaratory-judgment action seeking to determine its coverage, but did not obtain in that action a stay of the plaintiffs' action. The plaintiffs subsequently obtained a judgment against Metro for $3,150,000 in an arbitration procedure. The limit of Empire's coverage for Metro was $1,000,000. The judgment entered on the arbitration award stated that Metro was consenting to the award as a result of Empire's refusal to provide it with a defense and stipulated that Metro would be liable only to the extent of its insurance coverage. Empire's declaratory-judgment action was dismissed without prejudice. The plaintiffs then brought an action to enforce the judgment, claiming that Empire should be compelled to pay the entire judgment because of its alleged bad-faith refusal to settle or to defend the liability suit. The trial court determined that Empire's policy did not require it to provide coverage for its full $1,000,000 limit, but that the plaintiffs were entitled to enforce their judgment to the extent of the coverage required by state law, $200,000.[7] The trial court also held that the insurer was entitled to a jury *478 determination of any additional liability with respect to the plaintiffs' claim of bad-faith refusal to settle or to defend the liability action. Empire appealed, arguing that it was not liable in any respect. The plaintiffs cross-appealed, arguing that Empire was liable to the full extent of their judgment against Metro. The Georgia Court of Appeals affirmed the trial court's determination that Empire was liable to the plaintiffs to the extent of the state-required coverage, and that court also affirmed the trial court's finding that Empire was entitled to a jury determination of its liability in excess of coverage limits on the plaintiffs' bad-faith claims. However, the court also reversed the trial court's judgment insofar as it refused to allow the insurer to depose the arbitrator in an attempt to show collusion between the plaintiffs and the defendant.
We conclude that both Gardenhire and Driskell are distinguishable from the instant case in that they address orders denying an insurer's right to a jury determination of damages that exceed the limits of its policy as a result of a claim of bad-faith failure to defend or to provide coverage. Wheelwright's consent judgment in this case is applicable only to the extent that the insurance policies at issue provide coverage; Wheelwright does not seek to impose liability upon the insurers beyond the coverage of their policies based upon a claim of bad faith. Moreover, we note that both Gardenhire and Driskell imply that an insurer who has the right and opportunity to offer a defense and who declines to offer that defense may not relitigate the amount of a judgment its insured agreed to in good faith and within the limit of the insurer's coverage. The insurers in this case had both the right and the opportunity to provide Dorsey with a defense; they declined to do so.[8] We conclude that under the circumstances of this case, the insurers are bound by Dorsey's consent judgment settling Wheelwright's claims to the extent that the consent judgment was reasonable and entered into in good faith. Stone Building and Georgia Southern & Florida Ry., supra.
However, the insurers assert that the consent judgment was "per se" collusive because Dorsey agreed to the consent judgment only to the extent that the judgment would be paid by the insurers. They argue that because Dorsey agreed to be liable only to the extent of its insurance coverage, Wheelwright, the beneficiary of the consent judgment, should have the burden of showing that the consent judgment was not collusive. The insurers cite Steil v. Florida Physicians' Insurance Reciprocal, 448 So.2d 589 (Fla.Dist.Ct.App. 1984), and Griggs v. Bertram, 88 N.J. 347, 443 A.2d 163 (1982), in support of this contention.
In Steil, a medical-malpractice action, the plaintiff and the physician agreed to a settlement after the physician's insurer refused to defend the plaintiff's claim. The settlement provided that the physician was liable to the plaintiff in the amount of $35,000, and it assigned the physician's rights against his insurer to the plaintiff; in return, the plaintiff dismissed her claims against the physician and released him from all other liability. The plaintiff then filed an action against the insurer seeking coverage for the settlement amount. The *479 trial court in that action granted the insurer's motion to dismiss, and the plaintiff appealed. The Florida District Court of Appeal reversed the dismissal and held that the insurer would be liable to the extent of the settlement in the event that the trial court determined that the insurer had wrongfully refused to provide the physician with a defense. However, the court also determined that the fact that the settlement by the insured contained a covenant not to execute made the good faith of the settlement suspect and warranted imposition of the requirement that the party seeking to enforce the settlement have the initial burden of showing that it was reached in good faith. The court in Steil also discussed Griggs, supra, which had adopted a similar requirement under similar circumstances.
We decline to adopt the rule in Steil under the facts of this case for a number of reasons. First, the insurers in this case, unlike the insurer in Steil, were informed of the consent settlement and its terms, and they had ample opportunity to contest those terms before the settlement was approved by the bankruptcy court. Second, the circuit court's finding that the settlement was not collusive or made in bad faith is supported by the record, which shows that Wheelwright was claiming approximately $10,000,000 in damages and was prepared to present evidence showing damages in excess of $3,000,000.[9] Further, the facts permit an inference that the insurers expressly consented to the terms of the consent judgment by the phrasing of their objections to Wheelwright's motion for relief from the bankruptcy stay and approval of the settlement with Dorsey, in which they stated that they did not object "to the entry of a proper order at the proper time ... for the purpose of the entry of a consent judgment as announced by the litigating parties." Accordingly, we find no error in the circuit court's determination that the insurers are precluded from challenging the validity or the amount of the consent judgment.

B. The Insurers' Arguments That There Was No "Occurrence"

Each policy provides coverage for property damage only when that damage results from an "occurrence" that takes place within the respective policy's coverage period. Critical to the circuit court's conclusion that the policies of all the insurers provided coverage was its finding that the cracking of Dorsey's trailers constituted a continuous occurrence within the meaning of the term "occurrence," defined in the policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The circuit court stated:
"The cracking of the support system in the Dorsey trailers satisfies the definition. *480 of an `occurrence' because it constitutes an accident. An `accident' has been defined as `an unexpected happening rather than one occurring through intentional design' or `an event which takes place without one's foresight or expectation or design.' See City of Atlanta v. St. Paul Fire & Marine Ins. Co., [231 Ga.App. 206, 208,] 498 S.E.2d 782, 784 [ (1998) ]; United States Fidelity & Guaranty Co. v. Bonitz Insulation Co., 424 So.2d [569] (Ala.1982). The Court finds that the cracking in the trailers satisfies the definition of an occurrence because it is an accident or an unexpected happening that took place without foresight, expectation or design.
"The cracking in the trailers also falls within the definition of an `occurrence' because Wheelwright was continuously exposed to the crackingwhich was a harmful condition that was generally the same in all of the trailers. The cracking was not a series of occurrences but was, instead, a single occurrence that existed from the time when the cracks started until Wheelwright took the trailers out of service. This type of single occurrence that spans over a period of time appears to be contemplated by the `continuous... exposure' language. See Clemtex, Inc. v. Southeastern Fidelity Ins. Co., [807] F.2d 1271, 1276 (5th Cir.1987)(observing that the `continuous or repeated exposure to conditions' language in the definition of `occurrence' may be interpreted `to mean one continuous occurrence')."
The circuit court also determined that instances of trailers buckling and de-arching [10] were not separate occurrences, "but were, instead, simply a manifestation of the ongoing cracking of the trailers." The circuit court also noted that although Wheelwright had relied upon Dorsey's representations that "the trailers were designed to haul and [were] capable of hauling 50,000 pound concentrated loads and would have a ten year useful life," it would not find that Wheelwright's reliance was an occurrence under the policies.
After determining that the cracking was an occurrence, the circuit court addressed whether the occurrence took place during the policy periods:
"[A]ll of the policies define `property damage,' in part, as the `loss of use of tangible property that is not physically injured.' The policies all go on to state that `all such loss of use shall be deemed to occur at the time of the occurrence that caused it.' In other words, where the injured party claims property damage in the form of loss of use of tangible property that has not been physically injured, the Insurers' own policies dictate that the loss of use is deemed to have occurred at the time of the occurrence.
"Applying this definition of property damage, the loss of use of Wheelwright's tractors is deemed to occur at the time of the cracking of the Dorsey trailers. Therefore, the fact that Wheelwright's loss of use of its tractors for hauling heavy steel coils did not occur until 1998 does not negate coverage in the earlier policy period. Since the continuous cracking constitutes an occurrence triggering coverage in every policy period from late 1995 to the end of 1999, Wheelwright's loss of use of its tractors is `deemed to occur' in those policy periods."
*481 The circuit court recognized, and the parties all acknowledge, that Wheelwright's loss of the use of its tractors for hauling the concentrated heavy loads of steel coils did not actually take place until July 1998. In light of this fact, we consider whether the circuit court's analysis of when the "occurrence" took placei.e., that it was the continuous cracking of the trailers occurring as early as 1995, rather than the time of Wheelwright's loss of useis appropriate under the applicable caselaw. Initially, we note that the definition of the term "accident," as quoted in the circuit court's summary judgment from the opinions in City of Atlanta v. St. Paul Fire & Marine Insurance Co., 231 Ga.App. 206, 498 S.E.2d 782 (1998), and United States Fidelity & Guaranty Co. v. Bonitz Insulation Co., 424 So.2d 569 (Ala.1982), encompasses Wheelwright's unexpected loss of use of the trailers for the purpose of hauling heavy concentrated loads. Although the cracking in the trailers might itself fit within the definition of an "accident" as used by the circuit court, the evidence shows that Wheelwright did not lose the use of its tractors when the cracking in the trailers first began. Thus, we can ascertain no logical requirement arising from the policy definition of an "occurrence" as an "accident" for treating the continuous cracking of the trailers, rather than the ultimate failure of the trailers upon being loaded with the heavy coils, as the "occurrence" triggering coverage in this case. Moreover, the circuit court's determination that the cracking constitutes the occurrence in this case is undercut by the evidence showing that the duration of the cracking and its effect on the performance of the trailers for hauling other loads was uncertain. In addition, such a determination conflicts with the fact that the particular damages Wheelwright claimsthe loss of use of its tractors began only when the trailers first failed under the steel coils in July 1998.
In American States Insurance Co. v. Martin, 662 So.2d 245 (Ala.1995), this Court considered a certified question arising out of an action filed by the insurer, American States, seeking a declaration that it did not owe coverage to its insured, Martin, a real-estate investor, for damages to Martin's investors, the Bergers, arising from their investment losses. The policy provisions in the American States policy were substantially identical to those in this case with respect to what constituted property damage and what constituted an occurrence. The Bergers claimed, among other things, that their investments were continuously exposed to unsafe financial conditions over a long period and that as a result of that exposure they eventually lost those investments. The Bergers also claimed that they suffered mental anguish arising from incidents that occurred while the policies were in effect, but they admitted that they did not become aware of their losses, and begin suffering mental anguish, until after the policies had expired. This Court ruled as follows:
"This Court has stated that `as a general rule the time of an "occurrence" of an accident within the meaning of an indemnity policy is not the time the wrongful act is committed but the time the complaining party was actually damaged.' United States Fidelity & Guaranty Co. v. Warwick Development Co., 446 So.2d 1021, [1024] (Ala.1984). This Court recently reaffirmed that holding in State Farm Fire & Cas. Co. v. Gwin, 658 So.2d 426 (Ala.1995).
"The facts in State Farm v. Gwin are as follows: In May 1991, Stephen Gwin and his wife Jan Gwin sold two parcels of real property to Michael Dobson and his wife Wanda Dobson. State Farm insured the dwellings on each of the *482 parcels by providing coverage for `bodily injury, personal injury, or property damage... which occurs during the period this policy is in effect.' On the date of closing of the sales, the Gwins' insurance on the properties ceased and their coverage was transferred to the duplex into which they moved following the sale. After the sale of the parcels, the Dobsons discovered that the dwelling on one of the parcels was, among other things, infested with termites. The Terminex pest control company had treated the property for termite damage while it was owned by the Gwins. The Dobsons sued the Gwins and Terminex, alleging fraud and misrepresentation, and they apparently sought damages for emotional distress. State Farm sued for a judgment declaring that it had no obligation to defend or indemnify the Gwins with regard to the lawsuit filed against them by the Dobsons. We held that, pursuant to the reasoning in Warwick, there was no coverage for the Dobsons' emotional distress, because `any emotional distress related to the alleged misrepresentations would have occurred after the termination of the policy.' 658 So.2d 428 (emphasis in original).

"The language of the American States policies at issue in this case clearly provide[s] that an injury, and not an occurrence that causes injury, must fall within the policy period for it to be covered. The Bergers admit that any mental anguish they may have suffered would have been suffered after the two policies issued by American States had expired. We conclude that, because the Bergers' alleged suffering came after both American States policies had been terminated, there is no coverage for their `bodily injury' i.e., mental anguish, claims."
662 So.2d at 250 (final emphasis added).
Although Georgia does not appear to have any case as factually applicable to the instant case as American States, it does have authority that implies that an occurrence for purposes of policy coverage takes place when the insured suffers actual injury. See, e.g., Prescott's Altama Datsun, Inc. v. Monarch Ins. Co. of Ohio, 170 Ga.App. 545, 545-46, 317 S.E.2d 845, 846 (1984)(holding that an automobile dealer's liability insurer was not liable for any damage allegedly caused by the negligence of the dealer and sustained in an accident involving an automobile purchased from the dealer, or to defend the dealer in the negligence action, where the injury occurred outside of the policy period and "occurrence" was defined in the policy as "an accident, including injurious exposure to conditions, which results during the policy period, in bodily injury or property damages ....").
In this case, Wheelwright does not seek to recover damages because the trailers are cracked, and the evidence shows that Wheelwright regularly inspected the trailers, found no cracking, and used the trailers successfully to haul lighter distributed loads before the trailers failed in 1998 upon the loading of the steel coils. Rather, Wheelwright seeks to recover because it could not use its tractors to haul heavy loads of steel coils after the trailers failed in 1998. Although Deatherage's affidavit supports the inference that Dorsey's trailers were never suitable to haul heavy concentrated loads, even when new and undamaged, the loss-of-use claim underlying this litigation related exclusively to the loss of use of Wheelwright's tractors beginning in July 1998. Thus, viewing the cracking in the trailers as the continuous occurrence in this case would be prematurethe trailers were useable, and indeed were successfully and uneventfully used, for lighter distributed loads while presumably cracked and would have probably *483 failed upon loading of the steel coils even if they had not already begun to experience cracking. The "occurrence" in this case was not the cracking, but rather the failure of the trailers upon being loaded with the steel coils. Only at that time, in July 1998, did Wheelwright begin to suffer the damage that led to its claims against Dorseythe loss of the use of its tractors for the purpose of hauling the steel coils. The trailers continued to fail until Wheelwright's inspections in October 1999 revealed the cracking and the extent of the design problems in the trailers that required the removal of the trailers from service before the end of 1999. Thus, the continuous occurrence in this case was the failure of the Dorsey trailers during the period from July 1998 until the end of 1999.
As with the polices at issue in American States and Prescott's Altama, supra, the policies in this case all specify that they apply only to property damage that occurs within their respective policy periods. Because we conclude that the occurrence in this case is properly viewed as Wheelwright's loss of the use of its tractors because the Dorsey trailers could not haul steel coils and that that loss of use took place no earlier than July 1998, the policies of Liberty, GAN, and Federal had all expired before the occurrence. Accordingly, the circuit court erred in entering the summary judgments for Wheelwright against those insurers and erred in denying their respective motions for a summary judgment. We do not, therefore, address further any arguments advanced on appeal by those insurers. However, because we have determined that the occurrence was the failure of the Dorsey trailers to haul the heavy steel coils beginning in July 1998 and continuing until the trailers were removed from service at the end of 1999, and because Gerling's policies were in effect during that time, we proceed further to consider the propriety of the summary judgment for Wheelwright against Gerling.

C. Gerling's Procedural Arguments Concerning the Garnishment

Gerling asserts that the circuit court erred in denying its motions to dismiss Wheelwright's garnishment proceeding against it because, it says, the writ of garnishment was a compulsory counterclaim to its declaratory-judgment action pursuant to Rule 13(a), Ala.R.Civ.P., and Rule 13(a), Fed.R.Civ.P.[11] Gerling relies on the following statement in Rule 13(a):
"A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction."
Gerling argues that the garnishment "arises out of the transaction or occurrence that is the subject matter of" its declaratory-judgment action. That is, Gerling contends that the issue in its declaratory-judgment action is the extent to which its policies provide coverage for Dorsey against Wheelwright's claims and that that is the exact issue raised by Wheelwright's garnishment proceeding. Thus, Gerling argues, because the garnishment was not filed as a compulsory counterclaim in its declaratory-judgment action, assertion of the garnishment is *484 barred pursuant to the authority of Ex parte Cincinnati Insurance Co., 806 So.2d 376 (Ala.2001). That case held:
"The purpose of Rule 13 `is to avoid circuity of actions and to enable the court to settle all related claims in one action and thereby avoid a wasteful multiplicity of litigation on claims that arose from a single transaction or occurrence.' Grow Group, Inc. v. Industrial Corrosion Control, Inc., 601 So.2d 934, 936 (Ala.1992), citing 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil § 1409 (2d ed.1990). To effect the purpose of Rule 13, the consequence for failing to assert a compulsory counterclaim is a bar against the assertion of that claim in any other action. See Brooks v. Peoples Nat'l Bank of Huntsville, 414 So.2d 917, 920 (Ala.1982); Owens v. Blue Tee Corp., 177 F.R.D. 673, 682 (M.D.Ala.1998)."
806 So.2d at 379.
We conclude that this argument is without merit; Gerling's declaratory-judgment action was filed in October 2000, and Wheelwright did not have a judgment on which it could file a garnishment until March 23, 2001, long after the time for filing a responsive pleading to the declaratory-judgment action had passed.[12] Rule 13(a) is inapplicable because Wheelwright had no garnishment claims pending "at the time of serving the pleading the pleader has against any opposing party." As stated in 6 Charles Alan Wright et al., Federal Practice and Procedure: Civil § 1411 (2d ed.1990):
"[T]he party need not assert a counterclaim that has not matured at the time he serves his pleading. This is derived from the language in the rule limiting its application to claims the pleader has `at the time of serving the pleading.' A counterclaim acquired by defendant after he has answered will not be considered compulsory, even if it arises out of the same transaction as does plaintiff's claim."
(Footnotes omitted.) See also Wells v. Geneva County Bd. of Educ., 646 So.2d 98, 99 (Ala.Civ.App.1994)("The proper time to assert a counterclaim is in the responsive pleading ...."). The circumstances of this case are properly addressed by Rule 13(e), Ala.R.Civ.P., which states that "[a] claim which either matured or was acquired by the pleader after serving a pleading may, with the permission of the court, be presented as a counterclaim by supplemental pleading." Wheelwright's garnishment proceeding could have been presented in the declaratory-judgment action as a permissive counterclaim. See Safeco Ins. Co. of America v. Sims, 435 So.2d 1219 (Ala.1983); Brooks v. Peoples Nat'l Bank of Huntsville, 414 So.2d 917 (Ala.1982).
Finally, the United States District Court for the Middle District of Alabama considered and rejected Gerling's attempt to remove the garnishment proceeding, on the ground that the garnishment proceeding, with Gerling "standing in the shoes" of Dorsey, an Alabama corporation, lacked the requisite diversity for federal court adjudication. The federal court stayed the declaratory-judgment action in deference to the Barbour Circuit Court's determination of the coverage issues in the garnishment proceeding. The purpose of Rule 13(a) as articulated in Cincinnati Insurance, supra, of avoiding circuity and multiplicity of actions, is therefore accomplished.
*485 Gerling also argues that the circuit court erred in denying its motion to dismiss the garnishment action because of the operation of Ala.Code 1975, § 6-5-440. That statute, sometimes referred to as the abatement statute, states:
"No plaintiff is entitled to prosecute two actions in the courts of this state at the same time for the same cause and against the same party. In such a case, the defendant may require the plaintiff to elect which he will prosecute, if commenced simultaneously, and the pendency of the former is a good defense to the latter if commenced at different times."
Essentially, Gerling asserts that Ex parte Canal Insurance Co., 534 So.2d 582 (Ala. 1988), requires the dismissal of Wheelwright's garnishment action. That case held that § 6-5-440 required the dismissal of state-court breach-of-contract, fraud, and bad-faith claims against an insurer, which duplicated claims in a pending counterclaim in the federal district court, thereby recognizing federal district courts as "courts of this state" under the statute.
We reject this argument. Our disposition immediately above of Gerling's compulsory-counterclaim argument removes the underpinning of the argument Gerling makes in this regard, which is as follows: "The obligation imposed on a defendant under Ala. R. Civ. P. 13(a) to assert a compulsory counterclaim, when read in conjunction with § 6-5-440 `is tantamount to making the defendant with a compulsory counterclaim a "plaintiff" in that action (for the purposes of § 6-5-440) as of the time of its commencement.' Ex parte Breman Lake View Resort, L.P., 729 So.2d 849 (Ala.1999)." (Gerling's brief at p. 50.) Our determination that Wheelwright's garnishment action against Gerling was not a compulsory counterclaim in Gerling's declaratory-judgment action results in the conclusion that Wheelwright was not a plaintiff in two actions. It sought to proceed as a plaintiff only in the circuit court.

D. Gerling's Arguments Concerning Payment of the SIR Amount

Gerling also argues that it did not owe Dorsey coverage because Dorsey did not pay the required SIR amount. In pertinent part, the "Self-Insured Retention Endorsement-C" of the Gerling policies states:
"1. Our obligation to pay those sums that you become legally obligated to pay as damages applies only to the amount of damages in excess of any Self-Insured Retention stated in the Schedule above [$250,000] to which the Policy would otherwise apply, subject to the limits of Insurance set forth in the Declarations of the policy to which this Endorsement applies and the `occurrence' to which the Policy applies.
"....
"4. You [Dorsey] shall be responsible for the investigation, defense and settlement of any `claim' or `suit' for damages with the Self-Insured retention, and for the payment of all `Allocated Loss Adjustment Expenses.' You shall exercise the utmost good faith, diligence and prudence to settle all `claims' and `suits' within the Self-Insured Retention.
"We shall have the right but not the duty to participate with you at our own expense in the defense or settlement of any `claim' or `suit' seeking damages covered under the Policy. In the event of a `claim or `suit' which in our reasonable judgment may result in payments, including `Allocated Loss Adjustment Expenses,' in an amount in excess of the Self-Insured Retention, we may, at our sole discretion, assume control of the defense or settlement of such `claim' or `suit.' You will continue to be responsible *486 for the payment of the Self-Insured Retention.
"5. We shall only be liable for losses covered under the Policy up to the Limits of Insurance in excess of the Self-Insured Retention listed in the Schedule hereof, whether or not such Self-Insured Retention is recoverable or collectible."
In the summary-judgment order, the circuit court addressed the SIR payment as follows:
"Finally, the Insurers contend that they are not contractually obligated to provide coverage because Dorsey has not exhausted its $250,000 self-insured retention. It is clear from the record that the November 10, 2000 letter from Dorsey's attorney to the Insurers demonstrates that Dorsey tendered its $250,000 self-insured retention. Dorsey's bankruptcy, and its resulting inability to pay the $250,000 self-insured retention, does not, under the terms of the policies themselves, relieve the Insurers of their contractual obligations.
"The Court has found that the cracking of the Dorsey trailers from 1995 to the end of 1999 constitutes a single continuous occurrence. Although it is one occurrence, the cracking occurred over the course of five policy periods and thereby triggers coverage under all five policy periods. Since there is a single occurrence resulting in the loss of use of the Wheelwright tractors, the Court finds that only one self-insured retention amount of $250,000 must be satisfied in order to invoke the insurers' obligations. Since there was no evidence that Dorsey has actually paid its self-insured retention, the Insurers are entitled to a setoff of $250,000 from the total amount of the judgment in this case."
Gerling argues that the circuit court erred in finding as a fact that Dorsey had tendered the SIR amount. Essentially, it asserts that the letters in the record stating that Dorsey had tendered the SIR amount were improperly considered by the circuit court. The letters in question were attached as evidentiary submissions to Wheelwright's motions for a summary judgment against the insurers. The first letter is from Dorsey's lawyers to the insurers dated November 10, 2000; it states, in pertinent part:
"At the mediation of September 12, 2000, in this action, Dorsey's insurers failed to make a good faith effort to settle this case. As you know, Dorsey agreed to pay its deductible self-insured retention of $250,000 thereby invoking coverage under its general commercial liability policies."
The second letter is from Dorsey dated November 21, 2000, to the insurers; it states, in pertinent part:
"At the opening round of mediation on September 12, 2000, Dorsey agreed to tender its full self-insured retention amount of $250,000."
Gerling argues that the letters are inconsistent with the testimony of James S. Cribbens, Gerling's claims officer, who attended the mediations. Cribbens's affidavit states, in pertinent part:
"At no time did Dorsey or any of its representatives, during either of the mediation sessions, advise that Dorsey would pay the $250,000 self-insured retentions that were required to be satisfied as a pre-condition to application of the two policies issued by Gerling to Dorsey. Rather Dorsey's stated position was that it had satisfied most, if not all, of a $250,000 self-insured retention by virtue of its expenditures in connection with making repairs to the trailers that had been purchased by Wheelwright and Eufaula and in paying its *487 attorneys to defend it in the Underlying Action."
Viewing the evidence most favorably to Gerling, the nonmovant, as we must, Hanners v. Balfour Guthrie, 564 So.2d 412 (Ala.1990), we conclude that Cribbens's affidavit does raise a genuine issue of fact with respect to the question whether Dorsey tendered the SIR payment, and the circuit court has already determined that there was no evidence indicating that Dorsey actually paid the SIR amount. However, we conclude that the fact issue of the sufficiency of Dorsey's tender of the SIR amount is not material in light of the circuit court's application of a setoff in the amount of the SIR, now attributable only to Gerling. From paragraphs 1 and 5 of Gerling's SIR endorsement quoted above, it is apparent that Gerling acknowledges that it will be responsible (assuming that its policies otherwise provide coverage) for losses in excess of the SIR amount up to the limits of its policies "whether or not such Self-Insured Retention is recoverable or collectible." Thus, under the terms of the SIR provision in Gerling's policy, payment of the SIR cannot be viewed as a condition precedent to Gerling's obligation under the policy. Rather, the policy states that Gerling will be responsible for all covered liability in excess of the SIR, up to the policy limits. Under the circumstances of this case, the circuit court's setoff simply implements the language of the SIR exclusion.
Gerling also argues that the circuit court erred in not setting off the amount of its policy liability by the SIR payments for each of the two years its policies were in effect. The circuit court stated its rationale for including only one SIR amount in the setoff as follows:
"Both the law and equity dictate that a pro rata division of the judgment among the Insurers supports the payment of only a single $250,000 self-insured retention amount, especially in light of there being only one continuous occurrence. Courts have adopted this approach where one occurrence triggers several policy periods."
The circuit court relied upon Lafarge Corp. v. Hartford Casualty Insurance Co., 61 F.3d 389, 401 (5th Cir.1995); Clemtex, Inc. v. Southeastern Fidelity Insurance Co., 807 F.2d 1271, 1277 (5th Cir.1987); and Nationwide Mutual Insurance Co. v. Lafarge Corp., 910 F.Supp. 1104, 1108 (D.Md. 1996)(all holding generally that proration of an insurer's responsibility for liability resulting from a continuous occurrence should also result in a proration of the amount of the deductible to be received by the insurer).
Like the circuit court, Gerling has not cited any case in which Georgia courts have directly addressed the issue of prorating a SIR amount in the event of a continuous occurrence, and we have located none. However, Gerling does argue that the cases relied upon by the circuit court are distinguishable because, it says, those cases deal with deductibles under the respective policies involved, rather than with SIR provisions. In support of its argument that the circuit court should have set off a SIR amount for each respective policy period, Gerling relies upon Olin Corp. v. Insurance Co. of North America, 221 F.3d 307 (2d Cir.2000), and Uniroyal, Inc. v. Home Insurance Co., 707 F.Supp. 1368 (E.D.N.Y.1988).
In Olin the United States Court of Appeals for the Second Circuit applied New York law in interpreting the provisions of an annually renewed commercial general liability policy in an action arising out of the demand by Olin that its insurer provide coverage for damages arising from Olin's gradual release, from 1956 through *488 1973, of pesticide components into the environment surrounding its production facility. The court determined that it was appropriate to prorate the insurer's coverage and the responsibility for payment of damages among the various policies that were in effect during the period the damage occurred. Thus, the court determined that each yearly policy extended coverage to the extent that the damage from the continuing release of the pesticides took place during that year. The court also stated "that when multiple policies are triggered and liability is allocated to each, each policy's deductible is applicable." 221 F.3d at 328. The court in Olin explained its rationale as follows:
"Insurance policies are premised on an allocation of risk between the insured and the insurer. For any given occurrence, the policies Olin had with INA [Insurance Company of North America] allocated the first $100,000 of risk to Olin, the next $200,000 to INA, and any amount thereabove to Olin. By prorating the deductible but not the maximum per-occurrence coverage, Olin would upset this balance. The initial $100,000 of risk to be picked up by Olin would be spread over a period of time; the $200,000 of risk to be covered by INA each year would not be."
221 F.3d at 327 (footnote omitted).
In Uniroyal, the federal district court also applied New York law in a case brought by a manufacturer of "Agent Orange" seeking indemnification from its insurer. The court held that it was appropriate to apportion the payments for damages pro rata among the policies in effect over the period that the damage occurred, i.e., at each delivery of the product to the military. The court also held that Uniroyal was obligated to pay the deductible for each of the policy periods involved.
Although Olin also dealt with deductibles rather than with SIRs, we conclude that the rationale set out in that case most closely comports with the purpose and intent of the excess commercial liability policies Dorsey purchased for each year. As indicated by paragraph 1 of the SIR exclusion quoted above, the intent of each policy was that Dorsey would be responsible for the first $250,0000 of liability during the coverage period of that policy. Accordingly, that portion of the summary judgment setting off only a single SIR amount is reversed. Upon remand, the circuit court is instructed to determine the extent to which Dorsey satisfied the SIR requirements for each Gerling policy and to set off against Wheelwright's recovery against Gerling under the consent judgment the amount of the SIR for each respective policy that was not satisfied by Dorsey.[13]

E. Gerling's Argument that Dorsey Was "Not Legally Obligated to Pay"

Gerling argues that its polices contain provisions requiring it to pay only those sums, in excess of the SIR amount, that Dorsey became "legally obligated to pay." Gerling argues that because the consent judgment permits Wheelwright "to collect the judgment only to the extent that Dorsey's insurance provides coverage," Dorsey was never legally obligated to pay any part of the judgment. Gerling relies primarily on two cases it argued to the circuit court, Bendall v. White, 511 F.Supp. 793 (N.D.Ala.1981), and American Casualty Co. v. Griffith, 107 Ga.App. 224, 129 S.E.2d 549 (1963).
*489 In Bendall, the plaintiff obtained a $900,000 judgment against the defendant, White. White and the plaintiff entered into a "nonexecution" agreement pursuant to which the plaintiff agreed not to execute the judgment upon White's personal assets but to pursue only the coverage afforded under White's insurance. The court relied on Stubblefield v. St. Paul Fire & Marine Insurance Co., 267 Or. 397, 517 P.2d 262 (1973), to conclude that an agreement not to execute relieved the insured from the legal obligation to pay the judgment.
In Griffith, the minor defendant settled the plaintiff's claims against him by executing promissory notes to the plaintiff payable only to the extent that his insurer paid on his claims. The court in Griffith held that the defendant was not, under those circumstances, legally obligated to pay the judgment, and, therefore, the insured was not required to provide coverage under the terms of the policy.
The circuit court recognized that both Bendall and Griffith were "persuasive authority," but it declined to follow those cases. The circuit court stated:
"Since Bendall, numerous courts in other jurisdictions have held that an injured party's agreement not to collect a judgment against an insured does not necessarily nullify insurance coverage. See Auto-Owners Ins. Co. v. St. Paul Fire & Marine Ins. Co., 547 So.2d 148[, 151] (Fla.Dist.Ct.App.1989)(holding that a covenant not to execute on a judgment against an insured does not negate insurance coverage and stating that `many courts, including Florida's, look with disfavor on the idea that a covenant not to enforce against one party automatically releases that party's insurance carrier'). See also Red Giant Oil Co. v. Lawlor, 528 N.W.2d 524[, 529] (Iowa 1995) (holding that a plaintiff's agreement to collect only against a defendant's insurance company was merely a covenant and did not constitute a release of the defendants from liability and stating that the defendant `is still "legally obligated" to the injured party, and the insurer still must make good on its contractual promise to pay'); Coblentz v. American Surety Co., 416 F.2d 1059 (5th Cir.1969)(holding that an insurance company which chose not to defend its insured could not later deny coverage by asserting the `legally obligated to pay' provision in the policy after the insured reached a settlement where the injured party agreed to collect only against insurance proceeds)."
The circuit court also attached importance to the fact that the consent judgment allowing Wheelwright to collect only to the extent of Dorsey's insurance coverage was a result of Dorsey's filing its petition in bankruptcy. The circuit court stated:
"Numerous courts, including the United States Court of Appeals for the Eleventh Circuit, have held that a creditor's inability to collect from a bankrupt debtor cannot extinguish the liability of third parties, such as insurance companies, who may be secondarily obligated for the debts of the bankrupt debtor. See In re Jet Florida Systems, Inc., 883 F.2d 970, 975 (11th Cir.1989)(stating that the `"fresh start policy" [of the Bankruptcy Code] is not intended to provide a method by which an insurer can escape its obligations based simply on the financial misfortunes of the insured'). See also Jason Pharmaceuticals, Inc., 224 B.R. 315, 321 (Bankr. D.Md.1998) (stating that `the discharge in bankruptcy, along with the coextensive permanent injunction and fresh start, are exclusive to the debtor and do not otherwise affect the enforcement of any underlying debt, or any nondebtor liability thereon `)(emphasis in original);

*490 In re Bracy, 449 F.Supp. 70, 71 (D.Mont.1978)(holding that `if an insurance company is as a matter of state law liable to a plaintiff in the personal injury action, subsequent discharge of the assured in bankruptcy does not alter the obligation of the insurance company' and further finding that `it is the policy of the law to discharge the bankrupt but not to release from liabilities those who are liable with him')."
In a further response to Gerling's argument, Wheelwright contends that the "legally-obligated-to-pay" provision of the policies cannot be applied to deny Dorsey coverage under the circumstances of this case because the insurers refused to provide Dorsey with a defense. Wheelwright's argument on this point is essentially the same sort of argument we have already discussed in Part IV.A. of this opinion, in determining that Gerling was estopped to challenge the consent judgment because it had declined to offer a defense even though it had that right. See Georgia Southern & Florida Ry., supra.
In addition to the cases cited by the circuit court concerning the legally-obligated-to-pay argument, Wheelwright refers us to Metcalf v. Hartford Accident & Indemnity Co., 176 Neb. 468, 126 N.W.2d 471 (1964), in support of the argument that Gerling's failure to offer a defense when it had the right to do so should bar its argument in the garnishment proceeding that Dorsey was not obliged to pay the judgment. In Metcalf, the defendant entered into a settlement with the plaintiff agreeing to be liable for the judgment of $4,500, but only to the extent of the defendant's insurance coverage. In defending the plaintiff's claim based upon the judgment, the insurer argued that the defendant was under no obligation to pay. The court in Metcalf stated:
"The defendant is obligated under its insurance policy to defend the suit brought against Holder, an additional insured. This it refused to do. Holder was thereupon required to engage an attorney and provide his own defense. With the insurance company denying liability, Holder was entitled to use all reasonable means of avoiding personal liability. It was to his personal interest to consent to the $4,500 judgment and accept an agreement from the plaintiff not to execute on his property other than any rights to indemnity he might have in the designated insurance policies. The matter is of no consequence to defendant if its claim of nonliability is correct. Since its claim of nonliability has no validity, and it having declined to defend the action when called upon to do so, the defendant is in no position to attack the judgment in the absence of fraud, collusion, or bad faith. If the judgment was obtained in good faith, the insured may not again litigate the issues that resulted in the judgment."
176 Neb. at 475, 126 N.W.2d at 475-76.
We conclude that the weight of authority favors the circuit court's analysis of this issue. However, Gerling makes an additional argumentthat paragraph 4 in the SIR exclusion quoted earlier in this opinion gives Gerling the right, but not the duty, to offer a defense in situations where its insurer has not exhausted the SIR requirement.[14] As previously noted, an issue of fact exists with respect to whether Dorsey satisfied its obligations as to the SIR requirement. Gerling essentially argues that because it did not have a duty to *491 defend Dorsey before Dorsey exhausted the SIR requirement, the rationale for the summary judgment is less applicable to it. We are not persuaded by this argument, especially in light of the fact that Wheelwright was claiming damages that substantially exceeded Gerling's SIR amount and in light of the language in paragraph 4 of the SIR exclusion in Gerling's policies that gave Gerling the right to assume control of the defense of any action in which Gerling might reasonably expect to incur liability in excess of the SIR amount. Gerling's election not to exercise its right to offer Dorsey a defense left Dorsey to its own devices and thus free to agree to any reasonable, noncollusive consent judgment. The distinction between the rejection of a duty to defend and the rejection of a right to offer a defense is not, under the facts of this case, sufficient to effect a release for Gerling. See Red Giant Oil Co. v. Lawlor, 528 N.W.2d 524 (Iowa 1995), and Auto-Owners Ins. Co. v. St. Paul Fire & Marine Ins. Co., 547 So.2d 148 (Fla.Dist.Ct.App. 1989)(both holding that an agreement to proceed only against available insurance proceeds is not a release of the insurer).

F. Gerling's Argument Concerning "Property Damage"

Gerling also argues that the circuit court erred in finding that Wheelwright showed that it had sustained "property damage" under the terms of its policies. The circuit court held that Wheelwright had shown by undisputed evidence that its tractors, although physically undamaged, were rendered less useful as a result of the failure of Dorsey's trailers and that Wheelwright had lost profits as a result. The circuit court stated:
"Both Alabama and Georgia courts have found coverage for financial losses stemming from the loss of use of tangible property that is related to an insured's product or work, similar to the loss of use of Wheelwright's tractors stemming from the defective trailers. See Fitness Equipment Co. v. Pennsylvania General Ins. Co., 493 So.2d 1337, 1343 (Ala.1985)(holding that lost profits were covered where the insured's product, a motor used in a treadmill, was defective and caused lost profits on the sale of the treadmills); United States Fidelity & Guaranty [Co.] v. Andalusia Ready Mix[, Inc.], 436 So.2d 868, 871 [(Ala.1983)](holding that an insurer was obligated to pay for damages and a loss in value to a water treatment plant caused by the insured's defective product); Truitt Oil & Gas Co. v. Ranger Ins. Co., [231 Ga.App. 89,] 498 S.E.2d 572, 573 [(1998)](finding coverage where a gasoline leak from an insured's property caused loss of use of other real property); Haley v. Georgia Farm Bureau Mut. Ins. Co., [166 Ga.App. 596,] 305 S.E.2d 160, 162 [(1983)](finding coverage for lost profits and other damages caused by the insured's sale of infected swine). Therefore Wheelwright has demonstrated the existence of `property damage' under the Insurers' policies."
Although Wheelwright's evidence shows the loss of use was with respect to tangible property that had itself not been physically injured, i.e., the loss of the use of its tractors for hauling the most profitable loads, Gerling argues that Wheelwright's inability to use its tractors for the most profitable use is not "property damage" within the meaning of its policies. Specifically, it argues that the cases relied upon by the circuit court found property damage only where the property in question had been rendered useless. Gerling characterizes this as a "uselessness" requirement that must be shown to establish covered property damage under its policies.
For example, in Fitness Equipment Co. v. Pennsylvania General Insurance Co., *492 493 So.2d 1337 (Ala.1985), cited by the circuit court, this Court considered an appeal from a declaratory judgment holding that the insurer, Pennsylvania General Insurance Company ("Penn. General"), was not liable under its property-damage coverage to pay a consent judgment given by its insured Scott Air, Inc., a manufacturer of electric motors, to the plaintiff Fitness Equipment Company ("FEC"), in a separate, federal action. FEC was a manufacturer who used Scott Air's motors in manufacturing treadmills. The motors had proven inadequate to power the treadmills, and FEC had sought $6,000,000 in lost profits in the separate lawsuit in federal court. Scott Air subsequently agreed to a consent judgment pursuant to which it paid FEC approximately $53,000 and assigned its rights against Penn. General for approximately $300,000. While the federal action was pending, Penn. General filed its declaratory-judgment action, in which it relied upon the following provision to deny coverage:
"`This insurance does not apply:
"`....
(h)"`to loss of use of tangible property which has not been physically injured or destroyed resulting from
"`(1) a delay in or lack of performance by or on behalf of the named insured of any contract or agreement, or
"`(2) the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured.
"`(i) to property damage to the named insured's products arising out of such products or any part of such products....'"
493 So.2d at 1340. The policy also contained an exclusion stating that the insurance did not apply
"`(n) to property damage to the named insured's products arising out of such products or any part of such products....'"
493 So.2d at 1339. Approximately two months after the consent judgment was entered in the federal action, the trial court entered an order in the state declaratory-judgment action finding that Penn. General did not owe any coverage. FEC and Scott Air appealed.
In Fitness Equipment, this Court reversed the circuit court's declaratory judgment holding that the insurer was not liable, stating:
"We now focus our attention on the circuit court's conclusions with regard to the applicability of the various exclusions of the policy. The court correctly found that damages to the motors falls within exclusions (i) and (n). However, the treadmills also suffered `property damage,' or `physical injury ... including the loss of use thereof.' Exclusions (i) and (n), inasmuch as they pertain only to the work product of the insured, Scott Air, are inapplicable. Furthermore, in United States Fidelity & Guar. Co. v. Andalusia Ready Mix, Inc., 436 So.2d 868 (Ala.1983), this type of damage was held to be covered under a policy similar to that in the instant case. In Andalusia Ready Mix, defective grout was used in the construction of a water sewage treatment plant, and, as a result, the plant itself had to undergo extensive repairing and remodeling. Citing United States Fidelity & Guar. Co. v. Bonitz Insulation Co., 424 So.2d 569, 573 (Ala.1982), this Court stated:
"`if [an] occurrence or accident causes damage to some other property than the insured's product, the insured's liability for such damage becomes the *493 liability of the insurer under the policy.'
"436 So.2d at 870. Therefore, Penn. General is obligated to pay any judgment based on the damage[] to the treadmills."
493 So.2d at 1341-42. Gerling argues that the Court correctly held in Fitness Equipment that there was coverage because the plaintiff's treadmills were rendered completely useless as a result of the defendant's defective motors. It distinguishes the present case from Fitness Equipment on the basis that in this case Wheelwright's tractors were not rendered useless, merely less profitable. Similarly, it distinguishes United States Fidelity & Guaranty Co. v. Andalusia Ready Mix, Inc., 436 So.2d 868 (Ala.1983), discussed in Fitness Equipment, on the same rationalethe insured defendant's defective grouting in Andalusia Ready Mix rendered the plaintiff's water plant unuseable; thus coverage was proper under a loss-of-use-of-property exclusion similar to the exclusion in the present case. Gerling also attempts to distinguish Truitt Oil & Gas Co. v. Ranger Insurance Co., 231 Ga.App. 89, 498 S.E.2d 572 (1998), and Haley v. Georgia Farm Bureau Mutual Insurance Co., 166 Ga.App. 596, 305 S.E.2d 160 (1983), by arguing that in both of those cases the property was rendered useless by the occurrence that resulted in insurance coverage.
However, we note that the applicable definition for property damage, definition b. quoted in Part II.B. of this opinion ("[l]oss of use of tangible property that is not physically injured"), facially fits Wheelwright's loss of use of its tractors and does not specify any particular degree or extent of the loss of use. Further, we note that Fitness Equipment does not hold that the loss-of-use provision means that the property in question must be rendered completely useless. In fact, none of the cases cited in the circuit court's order specifically notes this interpretation of the loss-of-use provision. Our research indicates that neither Alabama nor Georgia has explicitly recognized a "uselessness" requirement in a similar context. Rather, the cases addressing property damage on this point consider products that have a specific use, such as the treadmills in Fitness Equipment, rather than a more general use, such as Wheelwright's tractors. That is, where the treadmills in Fitness Equipment could be used only for exercise walking, the tractors in this case could be used for a variety of purposes.
However, we are cognizant of McDowell-Wellman Engineering Co. v. Hartford Accident & Indemnity Co., 711 F.2d 521 (3d Cir.1983), and Wisconsin Label Corp. v. Northbrook Property & Casualty Insurance Co., 221 Wis.2d 800, 586 N.W.2d 29 (1998), cited by Gerling in support of its argument for a "uselessness" requirement to establish coverage for property damage. Those cases do recognize coverage under loss-of-use provisions similar to those in the instant case only when the property affected is diminished in value or made useless. Both of those cases rely on the "uselessness" requirement set out in Sola Basic Industries, Inc. v. United States Fidelity & Guaranty Co., 90 Wis.2d 641, 653-54, 280 N.W.2d 211, 217 (1979). Because McDowell-Wellman relied upon Wisconsin law set out in Sola Basic for its conclusion and because the rationale for the uselessness requirement in Sola Basic has been more recently discussed in Wisconsin Label, that latter case is of particular interest. In that case, Wisconsin Label sought a declaratory judgment that its insurer owed it coverage for damages arising from its mislabeling of a client's products. The loss-of-use provision at issue in Wisconsin Label was identical to the provision at issue in this case. In discussing *494 the "uselessness" requirement, the court stated:
"Because there is no physical damage to tangible property under the policy, Wisconsin Label must show `loss of use to tangible property not physically injured' to demonstrate coverage. As this policy provision reflects, the term `property damage' does not necessarily require physical damage. Sola Basic Ind. v. USF & G, 90 Wis.2d 641, 653-54, 280 N.W.2d 211, 217 (1979). Rather, tangible property may be damaged if `diminished in value or made useless,' even if the tangible property suffers no actual physical injury. Id. (emphasis added); see also ARNOLD P. ANDERSON, WISCONSIN INSURANCE LAW, § 5.17, at 5-49 to 51 (4th ed.1998) (discussing Sola Basic & noting same). As discussed below, because the mislabeling neither diminished the value of the products and packaging nor rendered them useless, Northbrook's policy does not cover the loss.
"The uselessness requirement originates in Sola Basic, 90 Wis.2d at 644, 280 N.W.2d at 212. Sola Basic sold a transformer to Thunder Bay Manufacturing Corporation for use in its manufacturing process. Id. When the transformer malfunctioned, Sola Basic repaired the transformer. Id. Thunder Bay alleged that Sola Basic's negligent performance of the repair damaged the transformer's windings. Id. As a result of the negligent repair, Sola Basic [sic] had to use another method while the transformer was being repaired; this method increased Thunder Bay's operating expenses. Id. Sola Basic removed and rebuilt the transformer at its own expense but did not make a claim to its insurer for that expense. Sola Basic's insurer denied coverage for the increased cost of operation, however. Id. The Sola Basic court reviewed case law from other jurisdictions and concluded that tangible property may be damaged if `diminished in value or made useless' irrespective of physical injury. Id. at 653-54, 280 N.W.2d at 217 (emphasis added). In holding that coverage existed, the Sola Basic court stated that the removal of the damaged transformer `rendered useless' Thunder Bay's electric furnaces, causing it to incur additional operational expenses. Id. at 654, 280 N.W.2d at 217."
221 Wis.2d at 812-13, 586 N.W.2d at 34. We note that the court in Sola Basic cited only Pittway Corp. v. American Motorists Insurance Co., 56 Ill.App.3d 338, 370 N.E.2d 1271, 13 Ill.Dec. 244 (1977), in adopting a "uselessness" standard for establishing coverage for loss of use. The court in Pittway held that "property damage" occurred when, because of the insured's defective aerosol-can valve assemblies, a third party's aerosol products were rendered valueless and destroyed. However, as in Fitness Equipment and the other cases cited by the circuit court, the Pittway court did not adopt a uselessness requirement. Thus, the "uselessness" requirement advocated by Gerling in this case appears to be limited to Wisconsin law beginning with Sola Basic.
We conclude that the rationale of Sola Basic does not warrant engrafting a "uselessness" requirement onto Gerling's policies concerning property damage under the facts of this case. Moreover, the disjunctive phrasing of the Wisconsin rule, "diminished in value or made useless," permits a loss of use to be recognized in a situation where the property in question is not rendered "useless" but rather is simply lessened in value through a contraction of its usefulness. The failure of the loss-of-use provision of the Gerling policies to specify the extent of the loss of use, whether *495 complete uselessness or diminishment in value for a particular purpose, means that, at a minimum, the provision is ambiguous and therefore due to be construed against Gerling under the circumstances of this case. See Georgia Farm Bureau Mut. Ins. Co. v. Meyers, 249 Ga.App. 322, 548 S.E.2d 67 (2001); Cherokee Credit Life Ins. Co. v. Baker, 119 Ga.App. 579, 168 S.E.2d 171 (1969). We believe that the approach of the cases cited by the circuit court, where the courts involved addressed the definition of property damage under the particular facts before them, is more appropriate than a rigid rule of "uselessness" that would not accommodate a fact situation involving a diminishment in value. Thus, construing the loss-of-use provisions of its policies most strictly against Gerling, we conclude that the circuit court was correct in determining that Gerling owed coverage for Wheelwright's loss of use of its tractors as a result of the failure of Dorsey's trailers.
Gerling also argues that Wheelwright's damages are excluded by provisions in its policies designed to exclude "business risks" by Dorsey. Those exclusions include exclusions for "damage to your product," "damage to your work," "damage to impaired property," and "recall of products, work or impaired property." Gerling asserts that the exclusions deny Dorsey coverage for the failure of its trailers to meet the requirements of its contract with Wheelwright. Gerling further argues that its insurance polices provide coverage "for tort liability for injury to persons and damage to other property[,] and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained," quoting Sapp v. State Farm Fire & Casualty Co., 226 Ga.App. 200, 205, 486 S.E.2d 71, 75 (1997). Gerling characterizes Wheelwright's claims as claims for economic losses arising from Dorsey's failure to build Wheelwright's trailers to the required contractual specifications. The circuit court specifically held, however, that Wheelwright lost the use of its tangible propertyits tractorsfor the purpose of hauling concentrated loads of 45,000 to 50,000 pounds.
Despite Gerling's arguments that Wheelwright's claims are entirely contractual, we note that Wheelwright's claims, from the outset, have included claims based on fraud, negligence, and the AEMLD. With respect to the "business-risk" exclusions, the circuit court stated:
"All of the policies state the insurance does not apply to `property damage to your product arising out of it or any part of it.' The Insurers contend that this exclusion precludes coverage for damages relating to the Dorsey trailers, such as the cracking, the de-arching, and the loss of use of the trailers. The Insurers further argue that Wheelwright is merely claiming damages as a loss of use of its tractors, as opposed to the Dorsey trailers, in order to avoid the effect of the `your product' exclusion. The testimony demonstrates, however, that Wheelwright in fact suffered damages as a result of the loss of use of its tractors for hauling the higher paying heavy steel coil freight. The trailers are, in a sense, a component part of the larger tractor-trailer units. The defect and cracking in the trailers rendered the tractors less useful and less profitable. This `property damage' is separate and apart from the damage to the trailers themselves. Courts in Alabama and Georgia have recognized that damages from the loss of use of tangible property relating to the insured's product is covered under general liability policies." *496 The circuit court cited Fitness Equipment, Andalusia Ready Mix, and Truitt Oil, supra, and concluded that the exclusions for damage to Dorsey's trailers did not exclude coverage for Wheelwright's claims based on the loss of use of its tractors. We agree.
With respect to the "damage-to-impaired-property" exclusion, the circuit court stated:
"The impaired property exclusion excludes property damage to `property that has not been physically injured, arising out or a defect, deficiency, inadequacy or dangerous condition in your product.' While this `impaired property' exclusion would appear initially to negate coverage for the loss of use of Wheelwright's tractors, since they are not physically injured, the exclusion contains its own definitional exception. The `impaired property' exclusion states that it `does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product"... after it has been put to its intended use.' Wheelwright correctly points out that this definitional exception applies in this case. In particular, the loss of use of Wheelwright's tractors arose out of a sudden and accidental physical injury to the Dorsey trailers after they were put to their intended use. After Wheelwright placed the Dorsey trailers into service, they suffered sudden and accidental physical injury in the form of cracking, buckling, and de-arching. Therefore, the `impaired property' exclusion does not negate coverage in this case."
Although we have rejected the circuit court's determination that the cracking of the trailers was the occurrence in this case, our determination that the failure of the trailers to haul concentrated loads is properly characterized as the occurrence does fit within the circuit court's rationale. In this case, the failure by the trailers was both "sudden" and "accidental," both in terms of the initial failure of particular trailers and in terms of the discovery that all of the Dorsey trailers were flawed. See Claussen v. Aetna Cas. & Sur. Co., 259 Ga. 333, 380 S.E.2d 686 (1989)(holding that the word "sudden" in a pollution-exclusion clause in a general liability insurance policy was ambiguous, i.e., was capable of more than one reasonable interpretation, and therefore would be interpreted in favor of the insured to mean "unexpected and unintended"). See also Alabama Plating Co. v. United States Fid. & Guar. Co., 690 So.2d 331 (Ala.1996), and United States Fid. & Guar. Co. v. Armstrong, 479 So.2d 1164 (Ala.1985)(both cases holding that the word "sudden" is ambiguous and may be construed against the drafter of the policy; Alabama Plating holding that the word "sudden" may properly be considered to mean "unexpected"). Accordingly, the circuit court's summary judgment for Wheelwright against Gerling is due to be affirmed, subject to the determination of the extent to which Dorsey satisfied its SIR obligations for calculating the setoff of the SIR amount of each Gerling policy.

V. Summary

In light of our determination that the appropriate date for the occurrence in the case is the time Wheelwright suffered the injury of the loss of the use of its tractors for hauling the steel coils, the summary judgments for Wheelwright against Liberty, GAN, and Federal must be reversed, and the causes in those cases are remanded for the circuit court to enter a summary judgment for each respective insurer against Wheelwright. We affirm the summary judgment for Wheelwright against Gerling, but that cause must also be remanded for the circuit court to determine *497 the extent of Gerling's liability under its policies with respect to Dorsey's payment of the SIR amounts as to each Gerling policy.
1010818REVERSED AND REMANDED.
1010819REVERSED AND REMANDED.
1010820REVERSED AND REMANDED.
1010821AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH DIRECTIONS.
MOORE, C.J., and HOUSTON, LYONS, BROWN, WOODALL, and STUART, JJ., concur.
SEE, J., concurs in the result.
JOHNSTONE, J., concurs in part and dissents in part.
LYONS, J., files statement of nonrecusal in case no. 1010820.
JOHNSTONE, Justice (concurring in part and dissenting in part).
In case number 1010821, I concur in the scholarly rationale save for the exception I will explain, and I concur in the judgment. In the cases numbered 1010818, 1010819, and 1010820, I respectfully dissent, for the reason I will explain.
My exception in case number 1010821 and my reason for dissenting in the other three cases is that I disagree with the main opinion in its conclusions (and the rationale for the conclusions) that the cracking itself was not the "occurrence" that caused the loss of use of the tractors and that the loss of use itself was the "occurrence." The policies themselves say otherwise:
"b. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the `occurrence' that caused it."
Thus, the "occurrence" is not the loss of use itself but is the cause of the loss of use. As the main opinion correctly observes all of the policies define an "occurrence" as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions." 851 So.2d at 474. The cracking is entirely consistent with this definition. Moreover, the record contains substantial evidence that the cracking itself was "sudden and accidental." Specifically, Wheelwright's engineering expert, Dr. J. Harold Deatherage, testified that the cracking would have begun during the very first four or five hundred miles of use of a trailer even with "a fairly low level of loading, maybe 20,000 pounds." Therefore, the impaired property exclusion, discussed in the main opinion, would not exclude coverage for the loss of use of the tractors "arising out of" the cracking.
At the very least in favor of Wheelwright, the policies are naturally and reasonably susceptible to these interpretations even if the policies may also be susceptible to contrary interpretations. This susceptibility at least renders the policies ambiguous. According to both Alabama law and Georgia law, ambiguities are to be construed in favor of the insured and in favor of coverage. State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293, 309 (Ala.1999); St. Paul Mercury Ins. v. Chilton-Shelby Mental Health Ctr., 595 So.2d 1375, 1377 (Ala. 1992); Sullivan v. State Farm Mut. Auto. Ins. Co., 513 So.2d 992, 994 (Ala. 1987); Georgia Farm Bureau Mut. Ins. Co. v. Meyers, 249 Ga.App. 322, 548 S.E.2d 67 (2001); and Cherokee Credit Life Ins. Co. v. Baker, 119 Ga.App. 579, 168 S.E.2d 171 (1969).
*498 The record contains substantial evidence that the cracking, the "occurrence," occurred during the respective terms of the respective policies of all of the insurers now before us. By the express text of the policies, already quoted, the loss of use of the tractors "shall be deemed to occur at the time of the `occurrence' that caused it." Therefore the trial court was right in holding all four of these insurers liable and in apportioning the loss among them. Thus, our judgments in the appeals by Liberty, GAN, and Federal should be like our judgment in the appeal by Gerling.
LYONS, Justice (statement of nonrecusal).
Wheelwright Trucking Co., Inc., the plaintiff-appellee, after oral argument several weeks ago in which I participated without objection, has moved for my recusal in case no. 1010820. Although the motion is not specific as to whether it is directed to me or to the entire Court, the issue of recusal is properly submitted in the first instance to the Justice made the object of the motion. Aetna Life Ins. Co. v. Lavoie, 470 So.2d 1060, 1089 (Ala.1984), vacated on other grounds, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986). For the reasons discussed below, I deny the motion. For a thorough discussion of the competing considerations presented by a judge's duty to decide cases and the concomitant duty to decide those cases impartially, see Justice See's statement of nonrecusal in Dunlop Tire Corp. v. Allen, 725 So.2d 960, 975 (Ala.1998). For a comprehensive discussion of the effect of a relative's affiliation with a law firm appearing before a judge, see Justice See's statement of nonrecusal in Archer Daniels Midland Co. v. Seven Up Bottling Co. of Jasper, Inc., 746 So.2d 966, 990 (Ala.1999). In Archer Daniels Midland, Justice See concluded that the constitutional duty to sit required the denial of a motion seeking his recusal because his brother-in-law was a member of the firm representing a party in that appeal. The brother-in-law had not appeared as counsel and otherwise had no interest that would be substantially affected by the outcome of the litigation.
Wheelwright's motion notes that my son is currently an associate with the law firm of Ferguson, Frost & Dodson, LLP, and that that firm represents one of the appellants. The motion makes no showing that my son has had any involvement in the matters made the basis of these proceedings, and I am not independently aware that he has had any involvement. The motion does not cite any legal authority to support the contention that I should recuse myself. The absence of authority is perhaps attributable to the fact that this issue does not arise in an uncharted area of the law. The general rule is set forth in Ala. Jud. Inquiry Comm'n Adv. Op. No. 97-665 (August 15, 1997) ("It is the opinion of the Commission that a judge is not obligated to recuse from hearing a case in which a law firm that employs the judge's daughter or son-in-law as an associate also represents a party and the relative does not participate in the case.").
NOTES
[1] Eufaula is an Alabama limited liability corporation; the nature of its role in the purchase of the trailers and its relationship with Wheelwright is not specified in the record. We infer from the record that Eufaula had a business and/or investment interest in Wheelwright.
[2] The circuit court did not award damages to Eufaula; the evidence before the trial court showed only Wheelwright's losses resulting from its inability to use Dorsey trailers to haul concentrated loads. Eufaula is not a party to this appeal.
[3] The orders by the federal court staying the respective declaratory-judgment actions are not included in the record but are attached as a supplement to Wheelwright's brief. Because none of the parties dispute the fact that the federal court stayed the declaratory-judgment actions, we recognize this fact without a discussion of when this Court might take judicial notice of a federal court's orders. See, e.g., Worthington v. Amerson, 741 So.2d 437 (Ala.Civ.App.1999).
[4] The definition and application of the SIR provisions in the respective policies are discussed further under the heading "The Insurance Policies," infra.
[5] The Federal umbrella policy uses this definition "with respect to bodily injury or property damage liability," but defines the term differently with respect to coverage that is unrelated to the issue in this appeal.
[6] The policy limits of Atlanta Casualty's coverage for Westbrook are not disclosed in Gardenhire; presumably the limits were less than $45,000.
[7] Under then applicable Georgia law, a "Form F" endorsement was required of the insurers of all licensed motor carriers to provide liability coverage in the amount of $100,000 per person and $300,000 per incident for the protection of the public for loss resulting from the negligent operation of the carrier's vehicles.
[8] Gerling argues that the "Self-Insured Retention Endorsement-C" in its policy changes its policy obligation from a duty to defend to a right to defend with respect to any claim of less than the $250,000 SIR amount. We conclude that this is a distinction without effect in light of the extent of Wheelwright's claims for damages of at least $10 million and the actual amount of the consent judgment. Under these facts, Gerling would have reasonably anticipated liability under its policies in excess of the SIR amount.
[9] The insurers argue that Wheelwright failed to prove damages because Ralph Summerford's expert report was not admissible evidence of damages. On November 13, 2001, contemporaneous with the issuance of the summary judgment in this case, the circuit court denied Gerling's motion to strike this report, stating "[t]he Court notes that this expert report was disclosed pursuant to the expert disclosure requirements in the underlying action. Furthermore, any evidentiary defect with the report could easily be corrected through the live testimony of Ralph Summerford as an expert witness." We need not address the evidentiary sufficiency of the report to prove Wheelwright's damages; we note simply that the report, considered in conjunction with Wheelwright's pleadings and Dennis Westbrook's testimony concerning the development of Wheelwright's business and the profitability of hauling steel coils, evidences that Wheelwright was prepared to present evidence of significant damages resulting from the failure of Dorsey's trailers and supports the inference that Dorsey's settlement by way of the consent judgment was not collusive or made in bad faith.
[10] Neither the record nor the parties define the term "de-arching"; we infer that the Dorsey trailers were constructed with an arch that ran the length of the trailer to provide additional support for hauling heavy loads. Thus, "de-arching" would be a flattening of the trailer's arch upon loading, which could indicate structural failure.
[11] Gerling does not argue any comparable Georgia rule, presumably in recognition of the choice-of-law principle that this Court will apply only the substantive, rather than the procedural, law of a sister state. Etheredge v. Genie Indus., Inc., 632 So.2d 1324 (Ala.1994); Fitts v. Minnesota Mining & Mfg. Co., 581 So.2d 819 (Ala.1991).
[12] The record does not disclose the nature or extent of Wheelwright's pleadings in Gerling's declaratory-judgment action, beyond its motion to remand the respective removals of its petitions for the writ of garnishment and the arguments on those motions.
[13] We recognize that the circuit court determined that Dorsey had not fully paid the SIR amounts. However, the record also contains evidence, including Cribbens's statements concerning Dorsey's defense expenditures, that Dorsey did incur expenses that could be attributable to payment of the SIR amounts.
[14] Gerling's policies otherwise provide that it has both the right and the duty to provide a defense.